**IN THE UNITED STATES COURT OF APPEAL
FOR THE ELEVENTH CIRCUIT**

**CASE NO. 15-14319-E**

JOE GORDILS, *et al.,*

Appellants,

vs.

OCEAN DRIVE LIMOUSINES, INC., *et al.,*

Appellees.

---

# ANSWER BRIEF OF APPELLEES

---

Arnaldo Velez
FL Bar 149589
ARNALDO VÉLEZ, P.A.
Counsel for Appellees
35 Almeria Avenue
Coral Gables, Florida 33134
Tel: 305-461-9499
Fax: 305-461-9498
avelez@velezlawoffices.com
georgina@velezlawoffices.com

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellees, pursuant to the Federal Rules of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-1, hereby certify that the following persons and entities have an interest in the outcome of this appeal:

1. Melissa Bennetti (Defendant/Appellee)
2. Richard Bennetti (Defendant/Appellee)
3. Ocean Drive Limousines, Inc. (Defendant/Appellee)
4. Ocean Drive Limousines, Inc. So. Fla. (Defendant/Appellee)
5. Arnaldo Velez (Appellate Counsel for Defendants/Appellees)
6. Arnaldo Velez, P.A. (Appellate Counsel for Defendants/Appellees)
7. Edilberto O. Marban (Defendants/Appellees' Counsel in the lower tribunal)
8. Law Offices of Eddy O. Marban (Defendants/Appellees' Counsel in the lower tribunal)
9. Joe Gordils (Plaintiff/Appellant)
10. Rider Morales (Plaintiff/Appellant)
11. Francisco Ramos (Plaintiff/Appellant)
12. Beymar Sabogal (Plaintiff/Appellant)
13. Pedro Sosa (Plaintiff/Appellant)

14. Rivka Fay Jaff (Plaintiff/Appellants' Counsel)

15. K. David Kelly (Plaintiff/Appellants' Counsel)

16. Joseph Perea (Plaintiff/Appellants' former Counsel)

17. Neil Rose (Plaintiffs/Appellants' Counsel)

18. J. H. Zidell (Plaintiffs/Appellants' Counsel)

19. J. H. Zidell, P.A. (Plaintiffs/Appellants' Counsel)

20. The Honorable James Lawrence King (United States District Judge)

ARNALDO VÉLEZ, P.A.
Counsel for Appellees
35 Almeria Avenue
Coral Gables, Florida 33134
Tel: 305-461-9499
Fax: 305-461-9498
avelez@velezlawoffices.com
georgina@velezlawoffices.com

By:/s/*Arnaldo Velez*
FL Bar 149589

## STATEMENT REGARDING ORAL ARGUMENT

An interesting verdict resulted in this case that upon its return was not challenged and presently is not being challenged for inconsistency. This verdict provides a backdrop upon which attempt is made to tear asunder the trial through oblique attack that a jury instruction was not given and addressed as errant a non award of liquidated damages. Appellees believe that upon consideration of the briefs, the issues will bear out that this is but an indirect attempt for a new trial when the required steps for one were not attempted and, as a result, are now foreclosed. A forum where the panel may inquire as to the validity of this belief would be in order and appropriate. That is why oral argument, where incisive questions may be posed, would be wise.

# TABLE OF CONTENTS


| | PAGE |
|---|---|
| CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT | CI-C2 |
| STATEMENT REGARDING ORAL ARGUMENT | i |
| TABLE OF CONTENTS | ii-iii |
| TABLE OF AUTHORITIES | iv-vi |
| STATEMENT OF THE ISSUES | 1 |
| STATEMENT OF THE CASE | 2-6 |
| STATEMENT OF THE FACTS | 7-20 |
| SUMMARY OF ARGUMENT | 21-22 |
| **ARGUMENT I** | 22-30 |

REGARDING THE JURY INSTRUCTION PROPOSED BY APPELLANTS PREDICATED ON 29 C.F.R. 531.35:

A. WAS THE ARGUMENT OF A FAILURE TO GIVE THE INSTRUCTION WAIVED OR NOT PROPERLY PRESERVED; AND

B. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN NOT GIVING THE INSTRUCTION WHERE:

I. THE INSTRUCTION DID NOT PERTAIN TO A VIABLE ISSUE;

II. A FACTUAL PREDICATE FOR THE GIVING OF THIS INSTRUCTION WAS WANTING;

III. THE JURY INSTRUCTION AS PROFFERED WAS IMPROPER; AND

IV. APPELLANTS WERE NOT IMPAIRED BY THE FAILURE TO GIVE THE INSTRUCTION.

**ARGUMENT II** 31-36

DID THE TRIAL COURT ABUSE ITS DISCRETION IN NOT AWARDING LIQUIDATED DAMAGES UNDER 29 U.S.C. 216(b)

CONCLUSION 37

CERTIFICATE OF COMPLIANCE 38

CERTIFICATE OF SERVICE 39

# TABLE OF AUTHORITIES CITED


| CASES | PAGE |
|---|---|
| Castillo v. Case Farms of Ohio, Inc.<br>96 F. Supp. 2d 578 (W. D. Tex. 1999) | 26 |
| Chambers v. Weinberger<br>591 F.Supp. 1554 (N.D.Ga. 1984) | 31 |
| Dennick v. Railroad Co.<br>103 U.S. 11 (26 L.Ed. 439) (1880) | 31 |
| Dybach v. State of Florida Dept. of Corrections<br>942 F.2d 1562 (11th Cir.1991) | 34 |
| Fuentes v. CAI Intern. Inc.<br>728 F. Supp. 2d 1347 (S.D. Fla. 2010) | 34 |
| Garcia v. Frog Island Seafood, Inc.<br>644 F. Supp. 2d 696 (E. D. N. C. 2009) | 26, 34 |
| Joiner v. City of Macon<br>814 F.2d 1537 (11th Cir. 1987) | 34 |
| Lasley v. Moss<br>500 F. 3d 586 (7th Cir. 2007) | 27 |
| Morgan v. Family Dollar Stores, Inc.<br>551 F. 3d 1233 (11th Cir. 2008) | 26, 35 |
| Morganelli v. Chemed Corp.<br>922 F. Supp. 2d 278 (E. D. N. Y. 2013) | 26 |
| Nimnicht v. Dick Evans, Inc.<br>477 F. 2d 133 (5th Cir. 1973) | 33 |

| CASES | PAGE |
|---|---|
| Puckett v. U. S.<br>556 U. S. 129; 129 S. Ct. 1423 (2009) | 25 |
| Rodriguez v. Farm Stores Grocery, Inc.<br>518 F. 3d 1259 (11th Cir. 2008) | 34 |
| Royal Cup, Inc. v. Jenkins Coffee Serv., Inc.<br>898 F.2d 1514 (11th Cir. 1990) | 36 |
| Stancill v. McKenzie Tank Lines, Inc.<br>497 F. 2d 529 (5th Cir. 1974) | 32 |
| Tony & Susan Alamo Found v. Sec'y of Labor<br>471 U. S. 290; 105 S. Ct. 1953 (1985) | 31 |
| Waas v. NPC International, Inc.<br>688 F. Supp. 2d 1282 (Kansas 2010) | 26 |
| Wilkes v. United States Postal Serv.<br>548 F.Supp. 642 (N.D.Ill. 1982) | 31 |
| U.S. v. Anderton<br>629 F. 2d 1044 (5th Cir. 1980) | 29 |
| United States v. De La Mata<br>266 F. 3d 1275 (11th Cir. 2001) | 28 |
| U. S. v. Dhingra<br>371 F. 3d 557 (9th Cir. 2004) | 29 |
| U. S. v. Dohan<br>508 F. 3d 989 (11th Cir. 2007) | 28 |
| U. S. v. Drury<br>836 F. 3d 1303 (11th Cir. 2005) | 28, 30 |

| CASES | PAGE |
|---|---|
| U. S. v. Garcia<br>405 F. 3d 1260 (11th Cir. 2005) | 28, 30 |
| United States v. Gold<br>743 F. 2d 800 (11th Cir. 1985) | 27 |
| United States v. Orr<br>825 F. 2d 1537 (11th Cir. 1987) | 27 |
| United States v. Williamson<br>746 F. 3d 987 (10th Cir. 2014) | 27 |
| Waas v. NPC International, Inc.<br>688 F. Supp. 2d 1282 (Kansas 2010) | 26 |


**Other Authorities Cited**


| | |
|---|---|
| Christopher N. May, *What Do We Do Now: Helping Juries Apply the Instructions*, 28 Loyola L. Rev. 869 (1995) | 29 |
| Walter W. Steele and Elizabeth G. Thornburg, *Jury Instructions: A Persistent Failure to Communicate.* North Carolina Law Review, 67 N.C. L. Rev. 77 (1988) | 29 |
| William H. Erickson, *Criminal Jury Instructions*, 1993 U. Ill. L. Rev. 285 (1993) | 28 |
| 29 U.S.C. 216(b) | 31 |
| 29 U.S.C. §§251-266 | 33 |
| 29 U.S.C. §260 | 34 |
| 29 C.F.R. 531.3(d)(1)(2) | 2, 24 |
| 29 C.F.R. 531.35 | 3, 23 |
| 26 A.L.R. Fed. 607 | 34 |

## STATEMENT OF THE ISSUES

I

Regarding the jury instruction proposed by Appellants predicated on 29 C.F.R. 531.35:

a. Was the argument of a failure to give the instruction waived or not properly preserved; and

b. Whether the trial court abused its discretion in not giving the instruction where:

i. the instruction did not pertain to a viable issue;

ii. a factual predicate for the giving of this instruction was wanting;

iii. the jury instruction as proffered was improper; and

iv. Appellants were not impaired by the failure to give the instruction.

II

Whether the trial court abused its discretion in not awarding liquidated damages under 29 U.S.C. 216(b).

## STATEMENT OF THE CASE

Pursuant to FRAP 28(b) and Rule 28(b)(2) of the Eleventh Circuit, Appellees provide additions to the Statement of the Case:

Appellants' four (4) count complaint contained general allegations identifying charges for gasoline and cleaning expenses.[1] These allegations were incorporated by reference in Count III, a count relying on 29 C.F.R. 531.3(d)(1)(2) for entitlement to reimbursement of expenses.[2] In that count Appellants specifically averred:

> *46. Pursuant to 29 C. F. R. 531.3 (d)(1)(2), the Defendants/Employers are prohibited from deducting from Plaintiffs' salary, charging its employees or computing Plaintiffs' wages factoring the cost of gas or cleaning which are primarily for the benefit or convenience of the Defendants/Employers thereupon including an "average of $250.00 per week for gas," alternating to $80.00 per week for same" during July through October.*
>
> *47. As a limo driver, during the months of November through June, Plaintiffs were required to pay an average of $250 per week for gas to be used in conjunction with the transportation of Defendant's clients and while driving the Defendant's vehicles and for washing the cars Plaintiffs drove. During the months of July through October, Plaintiffs were required to pay an average of $80 per week for same.* [[3]]

---

[1] D.E. 16 at pp. 5-8.

[2] This specifies:
*(d)(1) - the cost of furnishing "facilities" found by the administrator to be primarily for the benefit or convenience of the employer will not be recognized as reasonable and may not therefore be included in computing wages.*

[3] D.E. 16 at pp. 14-15.

At trial, Appellants proposed a jury instruction predicated on 29 C.F.R. 531.35, stating:

> ***Gasoline Cost Instruction in Relation to Plaintiffs' Wages***
>
> *Whether in cash or facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. This is true whether the "kick-back" is made in cash or in other than cash. For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act.* [But adding] ***You shall also apply such requirements to the gasoline and cleaning expenses paid by the Plaintiffs in this matter.***[[4]]

During discussion of the proposed jury instructions, while Appellees rule 50 motion directed to Count III was pending, the trial judge stated:

> *Turning to the matter of the second phase of the defendant's motion under Rule 50 for a judgment in favor of the defendant on the gas expenses, and by the way, this is also tangentially related to the proposed jury instruction which I believe was submitted by the plaintiffs* ***this morning*** *I saw. I guess, unfortunately, for all counsel and parties I say somewhat facetiously or joking, you are laboring under a handicap that I get here at 7:00 in the morning. So I read everything filed this morning. There was a reference to the car washing which is related to my decision to the gas expense, related because this was part*

---

[4] D.E. 262-1 at p. 23. All emphasis is supplied unless otherwise indicated.

*of the operation in which the employees, the plaintiff employees and all of the employees under the testimony of this record operated for a period of time. Some of the testified were there as long as three years, perhaps a little longer. One of the plaintiffs perhaps was only a matter of months. But all of the testimony reflects quite clearly I think that the parties operated under a practice where the employees paid for their gas, were expected to pay for their gas and were not reimbursed with checks or cash payments from the employer.*

*This is a course of dealing the parties operated under during their employment time and there is no real dispute over that. So that is one of the reasons why I believe this motion should be granted. I am going to grant your motions on the gas expenses.*

*Other reasons that in reviewing this, I looked at the testimony of Mr. Sabogal, I have to look down and read my note here. Beymar Sabogal. Forgive me if I am mispronouncing it. That testimony of Mr. Sabogal, plaintiff Sabogal, was really the primary and perhaps the only evidence in this record of receipts, the introductions of receipts for gas expenses. In reviewing this, that was Exhibit 27.*

*Now, the plaintiffs claim damages for the gas expenses. When pressed on cross-examination by Mr. Marban about his tax returns, he was asked, Mr. Sabogal was asked the direct question "are you still seeking reimbursement for gas expenses?" Given the preceding question having to do with having been given a credit for that on his tax returns and, thus, I suppose the argument was that he had been paid, albeit directly but from a different source namely under his tax return which enabled him to get relief from taxes he might have otherwise had to pay on his earned income. But Mr. Sabogal said no, he was not pursuing that claim.*

*Now, it can be argued that he was mistaken or perhaps confused, but the Court concludes that that is a factor that is a basis for my ruling along with the modus operandi of the parties and the procedures they used.*

*None of* ***the other plaintiffs, none of the other four had anything except their sworn testimony that they were estimated,*** *their gas, but they all testified that they paid it and they didn't get money back from the employers.*

*Apparently, my memory of each of them, they all said they claimed the exemption on their tax returns, and that's in the record. But summarizing all of this, I have formed the conclusion that the waiver of the expenses by Mr. Sabogal, the acquisition in the employment practice of paying for their own gas over the time they were there and not getting reimbursed, impels the conclusion that the motion should be denied.*

*Therefore, we will not be submitting to the jury the element of the gas expenses. That motion for the defendant company is granted.*[[5]]

\- - - - -

*THE COURT: I didn't think we were going to hear talk about gasoline in closing argument to this.*

*There is no question that the employees have operated under the system for months and years where they knew they had to pay for their own gas, top off the tanks when they returned the car and pay for it. So they did paid for it, but they didn't keep any receipts or introduce them except the one man who has waived his claim so there is no evidence in the record of what gas they paid is there.*

*MR. ZIDELL: There is, each one of them testified that they paid 80 during the low season and 220 for the high season.*

*THE COURT: Mr. Marban? Your position.*

*MR. MARBAN: The first thing you do is look at the regular rate. The employment agreement the testimony from Mr. Sosa is if you pay gases, your percentage of commissions goes up higher. If you don't pay*

---

[5] D.E. 311 at pp. 17-20.

> *gas, it's less. That's the employment agreement. That's the rate that they agreed to receive. That should go to the jury pursuant to the party's agreement.*
>
> *THE COURT: All right further?*
>
> *MR. ZIDELL: We find it to be a necessary instruction based on the evidence in the case.*
>
> *THE COURT: All right. Let me get a sticker. I will announce this at the end.*[[6]]

The requested charge was not given.

Neither in initial nor rebuttal closing arguments did Appellants attempt to discuss, advance, assert or mention anything regarding the gasoline and cleaning expenses. When Appellees' counsel in closing told the jury:

> *One very important thing. Remember all the talk about the fuel expenses. That's gone. That's no longer an issue. You're no longer have to determine that because that's what they agreed to.*
>
> *If you're a limo driver, and you have t pay for the gas, your commissions are going to be higher. If you don't pay for the gas, they are going to be lower. That's the employment agreed that they entered into. That's what they were paid.*[[7]]

Appellant's did not object, nor did they suggest that the argument was in any way erroneous or improper.

---

[6] D.E. 311 at pp. 32-33.

[7] D.E. 311 at p. 94.

## STATEMENT OF THE FACTS

Pursuant to FRAP 28 and Rule 28(b)(3), Appellees supplement Appellant's Statement of the Facts to include additional material.

During her testimony Appellee and principal of the Appellee company entities, Melissa Bennetti, testified regarding an exhibit prepared by culling trip sheets for the assignments given to each Appellant during the relevant periods. In explaining the exhibit (the figures of which were eventually used by the jury in determining overtime compensation to be given Appellants), Mrs. Bennetti testified:

> *A. Sure. For 2009, we have Francisco Ramos. Just so the jury can understand the chart, because I don't like to talk without an understanding of what we have.*
>
> *We have the date. We have the total number of trips that they did for us, the days they worked, the total hours that they drove. And we also took in consideration the travel time or preparing for the vehicle, getting -- the car needed to be maybe shammied down, whatever. In good faith, we have added time, which, I want you to understand, our business has minimums of hours. Three, five hours as I explained previously. And if you did a directed service and you only went one hour, I still paid the driver for a three-hour minimum. So it will never be more. These hours calculated would never be more. It would be less. But in good faith, we've added an hour wait time to each trip which would supplement going and coming.*
>
> *We also have the amount paid.*
>
> *We have also calculated the total driving hours with the rate that we paid them.*

*We divided the commission rate that we provided to them and we did the half time.*

*And we also did a separate chart with and without the hours. We did two examples. We did with the hours and without the hours, which is very conservative.*[8]

- - - - - -

Q. *All right. Now, so that we don't have to go through each Plaintiff one by one, is it fair to say that the amounts of overtime you calculate in this cart is the amount that you admit, as the corporate representative in this case, that each plaintiff is owed in overtime by you and your businesses*?

A. *No. I think - - like I have mentioned before, we were under the impression about the exemption.*[9]

Mrs. Bennetti also testified regarding payment of overtime stating:

*In the past, we were audited by the Department of Labor. They came to our facility, did a thorough investigation in our practice, and found out that we were not in any violation towards our practice.*

*In return, I understood that we were exempt from any type of overtime payment. Due to laws being changed and different types of cases that are coming out now, just recently, we found out that we're not under the exemption, but for other cases we are. So there is kind of a whole mix up whether we are or we're not. We were. Now we're not. But for the sake of this case, we created a chart to show the hours that they worked. And we have that in detail. If we're able to supply that,*

---

8 D.E. 298 at pp. 62:12-63:10.

9 D.E. 298 at p. 69. Thus, Appellants' insistence that she conceded owing overtime is inaccurate.

*I will be more than happy to show you on what weeks they actually worked less or more. It's all outlined and based on the trip sheets. Those trip sheets show what days they worked and for how many hours they worked. And it's all outlined in that chart.*[10]

- - - - -

*but, yes, that is correct. And in good faith, we were under the impression that we were exempt and now just recently we found out that we could possibly not be exempt. So there is a fine line between that and I'll let the Courts decide on that.*[11]

- - - - -

*A. Again, the same exact answer that I'm giving you as previous. We were under the impression that they were exempt. There are several cases that show that our drivers are exempt. And then there's other cases that show they are not exempt. So it is up to the Court. It is not my definition. It is not my belief. I don't want to say what I feel or what I don't. It's up to the Court. And I'm here and I want to make sure that we're in compliance and we're doing the right thing. That's our goal. And that's where I stand with that.*[12]

- - - - -

*Q. All right. Now, so that we don't have to go through each plaintiff one by one, is it fair to say that the amounts of overtime that you calculate in this chart is the amount that you admit, as the corporate representative in this case, that each plaintiff is owed in overtime by you and your businesses?*

---

10 D.E. 298 at p. 59:1-17.

11 D.E. 298 at p. 60:11-14.

12 D.E. 298 at p. 61:9-17.

*A. No. I think -- like I have mentioned before, we were under the impression about the exemption –*[[13]]

\- - - - -

*Q. All right. Now, before you had stated that -- and you referred to -- your attorney has also referred to the fact that you felt that your company did not have to pay overtime to its drivers, correct?*

*A. Correct.*

*Q. And that you think that that was based on what? What formed that belief, exactly, that you didn't have to pay overtime to your drivers?*

*A. It was our understanding when we got audited by the Department of Labor, that we were in compliance and that our drivers were exempt per the actual law that exist to the exemption. It was our understanding that our drivers were exempt from overtime hours.*[[14]]

\- - - - -

*A. No. Like I mentioned to you, when our practice was audited by the Department of Labor, I felt comfortable that while we're getting audited, we're understanding what the laws are and we are getting some type of training as to what the understanding is.*

*We understood that we were exempt and that's what has occurred.*[[15]]

\- - - - -

---

[13] D.E. 298 at 69:12-18.

[14] D.E. 298 at 72:14-73:1.

[15] D.E. 298 at 74:1-7.

> *Q. And did you represent to the DOL during that investigation, that these were independent contractor drivers that you were giving 1099s to?*
>
> *A. They understood that our drivers worked for other companies like the plaintiffs do. We gave a clear explanation that we advised. We told them how our employment agreement entails. We gave a full description of the way we pay our drivers. We also gave a description that they had the choice either not to do the job or to do the job based on their availability.*
>
> *Q. And so therefore the DOL accepted that as them being independent contractors?*
>
> *A. The DOL found no violation on behalf of Ocean Drive Limousines.*[[16]]

A theme of Appellants' case was that aside from engaging in trips as drivers, they were obligated to arrive early to work and spend all day at Appellees' place of business awaiting assignment.[17] Appellants also referenced harshness engaged in by Appellees Bennetti and sought to image a setting of exclusivity working solely for Appellees and having trouble making ends meet with the compensation they were receiving, presumably only from Appellees.[18] Most of the testimony was in

---

[16] D.E. 298 at 74:14-75:1.

[17] *See* Appellants' initial brief at pp. 15 and 19.

[18] D.E. 298 at pp. 114, 124, 125, 129; D.E. 299 at pp. 143, 145, 181, 182; D.E. 300 at pp. 5, 9, 55 and 56.

generalities unsupported by factual detail. Appellants' testimony was contradicted by testimony supplied by Melissa Bennetti.[19]

Additionally, through direct and cross examination of Appellants, the jury heard the following:

<u>From Joe Gordils</u>:

1. He was supposed to be paid a 20% commission and 20% base for a total of 40% but "we'd be lucky to make 3%".[20] No showing was provided as to when this actually happened.

2. That when tips were placed on credit cards, he would not get some of them, *it wouldn't be the 40%.*[21] No tangible evidence was adduced to corroborate this.

3. That on a "rough estimate" he worked at least 80 hours; on cross indicating he worked 13.33 hours daily, six days of the week.[22]

4. That he was paying "approximately $80 a week in expenses during the slow season and $250 during the high season, but that he would earn $800, $900 a week.[23]

5. That when one divides that $650 or so *by - or actually $550 by the 80 hours plus that he worked, he was making approximately, less than $7.00 an hour.*[24]

---

[19] D.E. 298 at pp. 55-57.

[20] D.E. 298 at p. 117.

[21] D.E. 298 at p. 117.

[22] D.E. 298 at pp. 117, 128.

[23] D.E. 298 at p. 118.

[24] D.E. 298 at pp. 118-119.

6. That his calculation of minimum wages and overtime owed from December, 2009 to December of 2012 was "close to $40,000, I would say."[25]

7. And that he spent a lot of time sitting around in the office because it was a requirement.[26]

8. On cross although he could barely make ends meet, he liked his job.[27]

9. On cross, it was shown that there were weeks when he had no jobs and weeks where he only made $42, $45 or $70 dollars from his trip tickets.[28]

10. When it was shown that he didn't work at all from September 30 through November, 2010, his response was "Hey you provided this; I can't tell you."[29]

11. When shown the summary of the trip tickets reflecting his actual trips, he responded:

> *That's what you provided here. That's what you're telling us. I see what you are saying. I gotta go with what you're telling me.*[[30]]

12. He was shown bank records whereby he deposited $6,000 in February of 2010.[31]

---

[25] D.E. 298 at p. 119.

[26] D.E. 289 at p. 114.

[27] D.E. 289 at p. 129.

[28] D.E. 289 at p. 130.

[29] D.E. 289 at p. 131.

[30] D.E. 289 at p. 131.

[31] D.E. 289 at p. 134.

13. When his attention was drawn to his being in Port St. Lucie on March 22, 2010, he initially maintained he may have been on a job that day. When shown that the records indicated he did not work on that day, he then had to admit he was not at Ocean Drive.[32]

14. When shown that on February 20, 2010 he made four banking transactions and asked to admit he could not have been sitting around Ocean Drive all day, his response was *"It's very possible, yes"*.[33]

15. On February 8, 2010, he was shown to have been at a dental appointment.[34]

16. He was asked about a banking entry that indicated he was at Lester's Diner in Ft. Lauderdale on February 23, 2010 and asked where he worked that day. His response was "**Oh, yeah, you're right. Come on**."[35]

17. Although Richard Bennetti one day had supposedly taken off his shirt and threatened a fist fight, he continued to run errands for him.[36]

18. When asked to account for deposits of 3,635 in the month of July, 2010, he first testified his father and he had a joint account but when pressed stated his father was retired.[37]

19. He admitted he was a fisherman and liked to travel to Key Largo.[38]

---

[32] D.E. 289 at pp. 134-135.

[33] D.E. 289 at p. 136.

[34] D.E. 289 at p. 137.

[35] D.E. 289 at p. 138.

[36] D.E. 289 at p. 140.

[37] D.E. 289 at p. 142-143.

[38] D.E. 289 at p. 140.

20. That in August he took a trip to Las Vegas for two nights.[39]

21. That he did work on the side for a Shelley Rutherford.[40]

22. That during 2010 he was also going to school - *math labs* - *"I went a couple of times*".[41]

23. That he took deductions for gas and other expenses on his income tax returns. As for his gas expenses he did not know what the average price per gallon was that he paid for gas - *"I don't know, 3 and change"*.[42]

<u>From Beymar Sabogal</u>:

1. At trial, Sabogal produced some 1,000 receipts for gas purchases over three years representing purchases made by him.[43]

When crossed regarding the receipts, they turned out to be receipts for purchases made by an Eric Leon, Robert Cruise, Robin Simon, Alejandro Pagara, and when questioned about them, his reaction was to state **"I don't know how you got that"**.[44] He also submitted receipts for purchases made in his wife's name but testified "she never drove. She don't have a car".[45] Receipts included purchases made when

---

[39] D.E. 289 at p. 143-144.

[40] D.E. 289 at p. 145.

[41] D.E. 289 at p. 146.

[42] D.E. 289 at pp. 123, 147-151.

[43] D.E. 299 at pp. 121-122.

[44] D.E. 299 at p. 148.

[45] D.E. 299 at p. 150.

he wasn't working for Appellees.[46] Eventually Sabogal withdrew his requests for reimbursement.[47]

2. Ms. Sabogal was also confronted with deposits he made into his bank account indicating receipts from sources other than Appellees and was unable to explain some of the deposits.[48]

From Rider Morales:

1. Initially testified that he was not claiming additional compensation for the period of August 5 through 19 of 2011 and August 26 through September because he had gone to Cuba.[49] He was then shown his answer to an interrogatory where he stated his claim was consecutively from June 2011 through July, 2012, at which point he said his statement was an estimation.[50]

2. He was also shown papers where he was applying for a hack driver's license where his sponsor was a company by the name of Conchita Transit and admitted that he visited Conchita for this purpose, admitting that when he did that he was not sitting around working at Ocean Drive.[51]

---

[46] D.E. 299 at pp. 150-151.

[47] D.E. 299 at p. 165.

[48] D.E. 299 at pp. 171-173.

[49] D.E. 299 at p. 194.

[50] D.E. 299 at pp. 194-195.

[51] D.E. 299 at p. 205-208.

From Francisco Ramos:

1. Ramos admitted he had worked for a trucking company during the claimed period and was then shown an answer to an interrogatory where he stated he had not worked for anyone else.[52]

2. He denied working for a Mr. Marshuke yet his banking records indicated receipt of $1,200 from Mr. Marshuka that he explained as a loan.[53]

3. A similar setting occurred when shown receipt of funds from a Dr. Agnashar that he thought was a loan. Eventually, he admitted driving Dr. Agnashar twice. However, in July, September and October, Dr. Agnashar gave him additional substantial checks on days he did not work for Ocean Drive explaining Dr. Agnashar was a good friend.[54]

From Pedro Sosa:

1. Sosa similarly testified that on the basis of being on stand-by he worked an average of 80 to 72 hours a week and that taking into account a discount for gas expenses during the slow season his wages were tantamount to $1.55 an hour.[55]

2. Albeit that the Bennettis' would scream at him in meetings he put up with the conditions because he couldn't find any other work.[56]

3. On cross it developed that he had worked for a Russian fellow and another whose name was "Fabian".[57]

---

[52] D.E. 300 at pp. 10-11.

[53] D.E. 300 at pp. 13-14.

[54] D.E. 300 at pp. 14, 16, 17, 18, 19.

[55] D.E. 300 at pp. 58-59.

[56] D.E. 300 at p. 61.

[57] D.E. 300 at p. 71.

4. Sosa stated that he didn't know exactly how many hours he sat around waiting.[58]

5. On cross, he stated that at one point he was seeing a physical therapist three times a week.[59]

6. That he had traveled to Costa Rica and that there were months when the deposits into his bank account exceeded that which was paid him by Ocean Drive.[60]

The jury also heard from Christine Gutierrez. The transcript shows this testimony on cross pertaining to her witnessing Appellant, Gordils, during her second stint.

> *Q. And can you quantify that for us at all in time or hours, that how often or how many hours you used to see him waiting, during that second period of time when you were there?*
>
> *A. I mean, I can't really quantify that. Like, it just depends on what the work was, you know, and what the business needed him as in that time.*[[61]]

Regarding her seeing Appellants waiting around, on cross, her testimony was:

> *Q. And, also, you mentioned that Mr. Sosa would wait around also. Do you remember that?*
>
> *A. Yes.*

---

[58] D.E. 300 at p. 68.

[59] D.E. 300 at p. 69.

[60] D.E. 300 at p. 83.

[61] D.E. 299 at p. 41.

*Q. And do you remember this question at my office also, under oath, just like you did for this jury.*
*Page 25, line 5.*

*Question: And you said that Mr. Sosa, he received favoritism. He didn't have to wait around that much, did he?*

*Answer: He didn't have to wait around. Sosa and Frank were usually called.*[[62]]

- - - - -

*Q. You also testified that the drivers were free to go home if they wanted to?*

*A. Yes, they could leave if they wanted to.*[[63]]

Additionally, Appellants omit references to witness Aileen Calero who worked as the main dispatcher from April, 2010 until September, 2012.[64] Ms. Calero testified she confirmed that jobs were placed some 12 to 24 house even before they were to occur.[65] Ms. Calero testified she would see some of the Appellants at times at 9:00 in the morning, *sometimes they were all there, sometimes none*.[66] She also confirmed none of the drivers were "full time" and were not required to stay on the business

---

[62] D.E. 299 at pp. 46-47.

[63] D.E. 299 at p. 55.

[64] D.E. 299 at pp. 61-61.

[65] D.E. 299 at pp. 63-63.

[66] D.E. 299 at p. 64.

premises.[67] She never heard Mr. Bennetti or Ms. Bennetti telling the drivers they had to be at the place of business until they got a job.[68] The drivers were free to come and go whenever they wanted to.[69]

Daisy Rodriguez called by Appellants initially denied that all jobs were pre-assigned 12 to 24 hours in advance but then this ensued.

> *Q. All right. I'm going to read from your -- do you remember going to my office and raising your right hand and swearing to tell the truth just like you did for this jury?*
>
> *A. Sometimes between 12 and 24. Not always.*
>
> *Q. My question is: Do you remember swearing to tell the truth?*
>
> *A. Absolutely. Absolutely.*[[70]]

And she later testified thusly:

> *Q. I'm asking a question, verbal words. Did you ever hear Mr. Bennetti say it's mandatory that you be here at 8 a.m. in the morning?*
>
> *A. No.*[[71]]

---

67 D.E. 299 at p. 69.

68 D.E. 299 at p. 70.

69 D.E. 299 at p. 78.

70 D.E. 299 at p. 107.

71 D.E. 299 at p. 109.

## SUMMARY OF ARGUMENT

A statutory framework with noble aspirations provided the ability of Appellants to commence this action. Once in the forum, the action, as any other action, must conform, as best as possible to required procedure. Selection of how to proceed in conformity with the procedure is what is called strategy. Strategic moves were elected by Appellants. Appellants now claim they didn't get a jury instruction they were somehow entitled to. Then Appellants lay blame on the trial court for not giving them discretionary liquidated damages.

Appellants now wish to semble that the instruction, requested and poised at the 11th hour relating to a claim then pending but dismissed under Rule 50, was not to that claim, but to another matter, one that they were well open to argue before the jury but chose not to. The protestation is carried further to make it seem that they were impeded or prevented from presenting their case. That is inaccurate because the proposed instruction did not pertain to a viable issue, there was insufficient evidence to have the jury consider it, its form was improper and most importantly, they were free to argue its substance and urge the jury for a return in their favor. Appellant's failure to argue was a strategic move, its election binds them and they cannot fault in anywise the lower tribunal.

Regarding liquidated damages, through the verdict the jury determined that Appellees had not violated the law. As a result there was nothing further to proceed. However, even if still within the scope of inquiry, abundant evidence showed Appellees acted with good faith, thereby enabling an exercise of discretion that disfavored any award of liquidated damages.

## ARGUMENT

## I

**REGARDING THE JURY INSTRUCTION PROPOSED BY APPELLANTS PREDICATED ON 29 C.F.R. 531.35:**

**A. WAS THE ARGUMENT OF A FAILURE TO GIVE THE INSTRUCTION WAIVED OR NOT PROPERLY PRESERVED; AND**

**B. WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN NOT GIVING THE INSTRUCTION WHERE:**

**I. THE INSTRUCTION DID NOT PERTAIN TO A VIABLE ISSUE;**

**II. A FACTUAL PREDICATE FOR THE GIVING OF THIS INSTRUCTION WAS WANTING;**

**III. THE JURY INSTRUCTION AS PROFFERED WAS IMPROPER; AND**

**IV. APPELLANTS WERE NOT IMPAIRED BY THE FAILURE TO GIVE THE INSTRUCTION.**

Appellants press error in failing to give an instruction predicated on 29 C.F.R. 531.35, that stated:

***Gasoline Cost Instruction in Relation to Plaintiffs' Wages***

> *Whether in cash or facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. This is true whether the "kick-back" is made in cash or in other than cash. For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act.* [But adding] ***You shall also apply such requirements to the gasoline and cleaning expenses paid by the Plaintiffs in this matter.***

None of the four counts in Appellants' Third Amended Complaint referenced this regulation as having a play in the claims. In Count III of their Third Amended (and operative) Complaint entitled Reimbursement of Expenses, Appellants incorporated prior allegations wherein they identified charges for gas and cleaning,[72]

---

[72] *See* ¶ 36, 37, 38, 39, 40 41, 42, and 43 of the Complaint. (D.E. 16)

specifically relying on provisions of 29 C.F.R. 531.3(d)(1)(2)[73] in support of an asserted claim for reimbursement of expenses, therein averring:

> *The Defendants/Employers are prohibited from deducting from Plaintiffs' salary, charging its employees or computing Plaintiffs' wages factoring the cost of gas or cleaning which are primarily for the benefit or convenience of the Defendants/Employers thereupon including an "average of $250.00 per week for gas," alternating to $80.00 per week for same" during July through October,*[[74]]

Logic and analysis indicates that the proffered instruction related or pertained to Count III, and that when the Rule 50 motion was granted for want of proof, Appellants concluded that the gasoline and cleaning expenses were no longer up for consideration. In closing, Appellants made no reference or attempt to reference whatsoever the expenses: they went ***silent*** on the matter. Discernible is that Appellants strategically took a chance and now, upon obtaining what they consider paltry sums, wish to extract a new trial on hopes of securing a better prize: a trial is not meant to be a "dress rehearsal" for clean up and a later restaging.

If Appellants considered the gas and cleaning expenses still within the mix for the jury to consider, the inquiry is: *why did they not proceed in that manner*? In their

---

[73] This specifies that:
*(d)(1) - the cost of furnishing "facilities" found by the administrator to be primarily for the benefit or convenience of the employer will not be recognized as reasonable and may not therefore be included in computing wages.*

[74] *See* ¶ 46 and 47 of the Complaint. (D.E. 16).

closing argument, Appellants were free to attempt to reference the gas and cleaning expenses and explain to the jury their play in the minimum wage claims. Appellants simply elected to not mention them, an election which is now binding upon them.

It is improper for a litigant to choose a path in a trial and later attempt to fault a trial judge for the litigant's error in choosing that path. Had Appellants been earnest in their position surely they would have raised the matter one way or another, perhaps encountered an objection, with the objection ruled on and then the point would have been preserved and be available for review. Appellants might have also objected when defense counsel in his closing argument stated that the fuel expenses were gone - but they did not. Likewise, on rebuttal closing, Appellants could have argued that defense counsel's statement was erroneous or misleading, but again nothing of the like occurred.

When a litigant believes error has occurred to his detriment, he or she must object or engage in an affirmative act in order to preserve the issue. A failure to do so in a timely manner, results in a forfeiture of a claim for relief from error.[75] Sandbagging a trial court by failing to raise before the lower tribunal the matter but then later source the inaction as error is fundamentally inappropriate.[76]

---

[75] *Puckett v. U. S.*, 556 U. S. 129, 134. 129 S. Ct. 1423,1428 (2009).

[76] *Puckett, supra*.

Since Appellants did not pursue the subject matter of the gasoline and cleaning expenses, they either waived the point or failed to preserve the error for appropriate review. Appellants should not be allowed to sandbag the trial court.

Consider also Appellants' claims for gasoline and cleaning expenses were approximations without competent proof. Competent proof is required.[77] Because of this Appellees' Rule 50 motion directed to Count III was granted and Appellants have not challenged the ruling. In attempting to argue the requirement of an instruction regarding a subject matter that was wanting in evidence and no longer for

---

[77] *See Waas v. NPC International, Inc.*, 688 F. Supp. 2d 1282, 1288, (Kansas 2010)(claims predicated on 531.35 asserting vehicle related expenses were not cognizable where they "alleged only conclusorily that the deficiency in reimbursements did bring their wages below the legal minimum. Accordingly plaintiffs have not produced facts from which a plausible claim may be inferred."); *Morganelli v. Chemed* Corp., 922 F. Supp. 2d 278, 294 (E. D. N. Y. 2013) minimum wage claim failed where Plaintiffs failed to show a single instance where the imposition of a call-back alone brought a technician's wages below the minimum wage for the week); *Castillo v. Case Farms of Ohio, Inc.*, 96 F. Supp. 2d 578, 638 (W. D. Tex. 1999)(a claimant bears the burden of showing that his wages were not free and clear *through competent evidence rather than assertions*); *see also Garcia v. Frog Island Seafood, Inc.* 644 F. Supp. 2d 696 (E. D. N. C. 2009) (claim under statute requiring employer to pay every employee all wages accruing to the employee on a regular payday and upon failure to do so, the employer is liable to the employee in the amount of unpaid amount based on claim that when employees were paid on a piece rate they were "normally...not paid for more than 4 pounds of crabmeat even if the amount of crabmeat weighed more than four pounds" failed for want of competent proof that could form a sufficient basis upon which to base a finding of the number of occasions during which the inaccurate weighing or recording occurred or of the alleged extra pounds of crabmeat picked).

consideration by the jury, what Appellants are attempting to do is to indirectly challenge the Rule 50 ruling. But, they are now foreclosed from doing so by their own voluntary election to not challenge the ruling. Manifestly, under the circumstances the proposed instruction was not of assistance to the jury because it no longer pertained to an outstanding issue: it was properly rejected.

Additionally, as acknowledged by Appellants, a court *has broad discretion in constructing its charge*[s] *within the confines of the law and the facts at hand.*[78] True a district court should issue instructions that are correct legal statements conveying relevant principles of law in full but *a district court is not required to issue a perfect set of jury instructions.*[79] Thus, [*A*]*n additional instruction is not required if it would simply give the jury a clearer understanding of the issues...*[80] And, a refusal to give a jury instruction is reversible only if (1) the instruction is substantially correct; (2) the instruction was not addressed in a charge that was actually given; and (3) a failure to give the requested instruction seriously impairs a party's ability to present a

---

[78] Appellants' brief at page 27 citing *United States v. Orr*, 825 F. 2d 1537, 1542 (11th Cir. 1987) drawing in turn from *United States v. Gold*, 743 F. 2d 800, 819 (11th Cir. 1985).

[79] *Lasley v. Moss,* 500 F. 3d 586, 589 (7th Cir. 2007).

[80] *United States v. Williamson*, 746 F. 3d 987, 900 (10th Cir. 2014).

defense or claim.[81] "Seriously impairs" requires a showing of an impediment to present a case upon viewing other charges and leeway affordable to counsel to present and argue a case.[82] Reversal can occur only when a review of the instructions leaves "*a substantial ineradicable doubt as to whether the jury was properly guided in its deliberations* on the matter.[83]

Assuming the issue of gas and cleaning expenses was extant, no dispute exists that the proposed charge, *sans* the last sentence, is other than an accurate extract of 29 C.F.R. 531.35. The inquiry, though, is whether this charge would have aided the jury.[84] Is the subject instruction truly comprehensible, and consonant with educatory

---

[81] *United States v. De La Mata*, 266 F. 3d 1275, 1298 (11th Cir. 2001).

[82] *See U. S. v. Drury*, 836 F. 3d 1303 (11th Cir. 2005) where even if requested charge in a murder for hire trial regarding solely believability of a witness that was not addressed in a pattern instruction was not given, nonetheless the court permitted defendant to argue vigorously that the witness possessed bad reputation for truthfulness and thus, no impediment was shown; *U. S. v. Garcia,* 405 F. 3d 1260 (11th Cir. 2005) (claim for failure to give requested jury instruction rejected albeit instruction was a substantially correct statement of the law because its commission did not prevent defendant from arguing matter based upon evidence).

[83] *U. S. v. Dohan*, 508 F. 3d 989, 993 (11th Cir. 2007).

[84] In an article appearing in 1993 Ill. L. Rev. 285 (1993), Justice William H. Erickson of the Colorado Supreme Court remarked that *"Jury instructions contain the law that jurors must apply to the facts of the case before them. Without understandable jury instructions, jurors cannot perform their legal duty or properly decide cases based upon the applicable law. Nevertheless, jurors in criminal cases often do not understand the instructions given by a trial judge. For a trial judge attention exists between giving jury instructions that are understandable to an*

characteristics requisite for a proper jury instruction? We ask the Court consider a role as a juror and examine whether *"free and clear", "kick-backs" directly or indirectly,* or *whether the "kick-back" is made in cash or in other than cash* would have been understandable and of assistance in making a determination as to wages *sans* argument or explanation.[85] With this thought, the observation that no attempt was made by Appellants to argue or explain anything to the jury regarding gas and washing expenses returns to the fore.[86]

Additional consideration must be given as to whether any possible showing has been made apparent that upon receipt of the instruction there was a probability or even a plausibility that the jury would have rendered a verdict any different from that

---

*average juror and minimizing the risk of appeal by retaining technical legal language that may be incomprehensible to a lay person.*

An instruction using solely the language of a statute or regulation appears proper if the words are of clear and simple import and generally understood meaning. *See e.g. U.S. v. Dhingra*, 371 F. 3d 557, 567 (9th Cir. 2004). But, if an instruction uses a term of legal or somewhat technical significance then the meaning must be explained. *See U.S. Anderton*, 629 F. 2d 1044, 1049 (5th Cir. 1980).

[85] We must be mindful that jurors' efforts are often undermined by jargon filled, convoluted prose used by lawyers. *See* Steele, Walter W. and Thornburg, Elizabeth G., *Jury Instructions: A Persistent Failure to Communicate.* North Carolina Law Review, 67 N.C. L. Rev. 77, note 2 at 98.

[86] It has been observed that jurors learn the law from the lawyers' closing arguments. *See e.g.* Christopher N. May, *What Do We Do Now: Helping Juries Apply the Instructions*, 28 Loyola L. Rev. 869, 895-96 n. 129 (1995) (noting the belief that good attorneys explain the law to the jury).

which it did. Appellants posited a setting of servitude having to hang around to get what they, in general language, alluded to as insufficient compensation. Leaping from the transcript is that with cross examination, Appellants' credibility was sorely checked - in short, they were not credible and the jury made short shrift of their story by answering that Appellees had not violated the laws pertaining to wages.

Moreover, jury instructions should be without suggestion or bent to any party. Peril lurks where there is undue emphasis or suggestion in an instruction. Appellants rest upon a recitation of a regulation to which they add *"You **shall** also apply such requirements to the gasoline and cleaning expenses paid by the Plaintiffs in this matter."* With this recitation there is undue emphasis on the gasoline and cleaning expenses and the neutrality of the instruction disappears for now there is a "requirement" that "must" be applied. Hence, the charge as proposed was improper.

Finally, it is all apparent that Appellants were not seriously impaired in presenting their case. No impediment was present disabling them. They could, but did not, make argument regarding expenses.[87] Moreover, when properly viewing the ruling on the Rule 50 motion regarding Count III, and the instructions actually given, no doubt arises that *the jury was properly guided in its deliberations* on the matter.

---

[87] *See* cases cited in footnote 82, *supra.*

## II

### DID THE TRIAL COURT ERR IN NOT AWARDING LIQUIDATED DAMAGES PURSUANT TO 29 USC 216(b)

The text of 29 USC 216(b) materially provides:

*"Any employer* ***who violates the provisions of*** **[the FLSA]..***.shall be liable to the...employees affected in the amount of their...unpaid overtime compensation...and an additional equal amount as liquidated damages.*

Liquidated damages are purely a creature of statute.[88] Even if the statute be construed liberally to apply to the furthest reaches consistent with congressional direction to accomplish the FLSA's purposes[89], nonetheless the statute has no application when there is a finding that a person has not violated the act. Appellants overlook the jury's finding that Appellees did not "[fail] to pay Plaintiffs' overtime wages required by law." Hence, on the plain text of the statute there is no entitlement to liquidated damages. While upon consideration of the monetary award for overtime contained in the verdict, that verdict may have been inconsistent, it was not timely

---

[88] *Chambers v. Weinberger,* 591 F.Supp. 1554, 1557 (N.D.Ga. 1984) (citing *Dennick v. Railroad Co.*, 103 U.S. (13 Otto) 11, 17, 26 L.Ed. 439 (1880)); *Wilkes v. United States Postal Serv.,* 548 F.Supp. 642, 642 (N.D.Ill. 1982).

[89] *Tony & Susan Alamo Found v. Sec'y of Labor*, 471 U. S. 290, 296, 015 S. Ct. 953 (1985)

objected to, and as a result the finding on the issue of failure to pay as required by law remains, and does not entitle Appellants to prevail on this issue.

In examining the unobjected to inconsistent verdict the Court may consider *Stancill v. McKenzie Tank Lines, Inc.*, 497 F. 2d 529 (5th Cir. 1974) involving an interrogatory verdict where the jury (a) determined both parties to an accident were negligent, (b) found Plaintiff's decedent father was the "proximate cause of the accident" but (b) nonetheless denied any damages to the Defendant for loss of its truck. On appeal by the Plaintiff seeking a new trial, the court observed that by failing to timely object the inconsistency had been waived. That court also viewed the result as the jury's improper desire "*not to visit the negligence of the deceased father upon the Plaintiff but there was nothing to believe that it was the result of compromise on the liability issues*. Of additional importance was the observation that the only party to benefit from a new trial was the Defendant and a new trial would not be ordered to aid a non-appealing party.

*Stancill* is analogous as Appellants waived asserted inconsistency and cannot be heard to complain. Certainly the jury **expressly** found no failure to pay as required

by law. Thusly, the finding must be left undisturbed.[90] With that finding there is no consideration of extending liquidated damages to Appellant.

Additionally, the granting of liquidated damages is not automatic for as conceded by Appellants the Portal to Portal Act, 29 USC §§251-66, in particular §260, permit a trial court to not award liquidated damages if an employer establishes that it acted in good faith and under the a reasonable believe that the employer was in compliance the FLSA. This Circuit has articulated the following standard regarding the good faith defense:

> *An employer who seeks to avoid liquidated damages bears the burden of bears the burden of proving that its violation was "both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict."*...citations omitted. *An employer, who knew or had reason to know that the FLSA applied, could not establish good faith as a defense. ... Thus, the district court's decision whether to award liquidated damages does not become discretionary until the employer carries its burden of proving good*

---

[90] *Cf. Nimnicht v. Dick Evans, Inc.*, 477 F. 2d 133 (5th Cir. 1973) (In Seaman's actions where jury responding to questions determined a barge was not unseaworthy and employer not negligent, but found $13,500 in damages, entry of judgment in favor of Defendants by trial court was appropriate on the reasoning that:

> *In the absence of unseaworthiness or negligence, damages could not be awarded. The jury should not have responded [to the damage] interrogatory...The fact that it mistakenly did so could not change the answers to the prerequisite questions, upon which any damages at all had to live or die.*

477 F. 2d at 135.

*faith. In other words, liquidated damages are mandatory absent a showing of good faith.....*[[91]]

Determination of whether or not an employer has acted in good faith, with requisite reasonable grounds so as to result in a non imposition of liquidated damages under § 260, involves a question of fact to be answered in the light of the particular circumstances of each individual case.[92] To satisfy the good faith requirement the employer must show that it acted with both objective and subjective good faith. [93] It is a mixed question of fact and law.[94] *Fuentes* adds [*T*]*o establish subjective good faith, the burden of proof is on the employer to show that "[it] had an honest intention to ascertain what [the Act] requires and to act in accordance with it.*"[95]

*Garcia v. Frog Island Seafood, Inc.*, 644 F. Supp. 2d 696 (E. D. N. C. 2009) supplies this coloring:

*The good faith defense requires that an employer provide adequate proof that it did not take an "ostrichlike" approach to the FLSA by*

---

[91] *Joiner v. City of Macon*, 814 F.2d 1537, 1539 (11th Cir. 1987).

[92] 26 A.L.R. Fed. 607 .

[93] *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F. 3d 1259, 1272 (11th Cir. 2008).

[94] *Fuentes v. CAI Intern. Inc.*, 728 F. Supp. 2d 1347, 1357 (S.D. Fla. 2010) referencing *Dybach v. State of Florida Dept. of Corrections,* 942 F.2d 1562, 1566 (11th Cir.1991).

[95] *Fuentes*, 728 F. Supp. 2d at 1357.

> *"simply remain[ing] blissfully ignorant of FLSA requirements." Roy v. County of Lexington, 141 F.3d 533, 548-49 (4th Cir.1998) (quoting Burnley v. Short, 730 F.2d 136, 140 (4th Cir.1984)). Rather, "an employer [must] take active steps to ascertain the dictates of [an act] and then move to comply with them." Reich v. Southern New England Telecomm. Corp., 121 F.3d 58, 71 (2d Cir.1997); see also Barcellona v. Tiffany English Pub. Inc., 597 F.2d 464, 469 (5th Cir. 1979) (explaining "good faith requires some duty to investigate potential liability under the FLSA").*

Ample evidence was submitted to show good faith. Appellees had been audited by the Department of Labor with no wrongdoing found in its practices.

In considering this point, it is helpful to visit *Morgan v. Family Dollar Stores, Inc.*, 551 F. 3d 1233 (11th Cir. 2008) to evaluate the preclusive effect, if any, of a jury finding based on willfulness of a violation of FLSA that extends the Statute of Limitations, on the issue of "good faith" exonerating the imposition of liquidated damages. In *Morgan*, this Court stated:

> *While this was an open question in our circuit in 2006—the time of the second trial—our subsequent decision in Alvarez Perez forecloses Family Dollar's argument. In Alvarez Perez, we concluded that "in an FLSA case a jury's finding in deciding the limitations period question that the employer acted willfully precludes the court from finding that the employer acted in good faith when it decides the liquidated damages question." 79 515 F. 3d at 1166. Thus, under Alvarez Perez, the district court did not err in concluding that the jury's finding of wilfulness precluded a good faith finding. Id. at 1165-66. Accordingly, the district court did not err in awarding Plaintiffs $17,788,029.32 in liquidated damages, representing an amount equal to the back pay award...*

It is mandatorily a corollary of the foregoing rule that if no wilfulness is found by a jury, a trial judge may then proceed with permitted discretion, to determine that the evidence is sufficient to show a good faith basis pursuant to §260 and not award liquidated damages.[96]

The experienced trial judge had a full view of the entire case: its pleadings, the pre-trial record and the evidence presented at trial. The trial judge well discerned that it was appropriate to view Appellees as persons subjected to scrutiny by an experienced government agency who believed in good faith that they were in compliance. Thus, even assuming the matter of liquidated damages was available for consideration, the presence of good faith negated any award.

---

[96] This approach would be consistent with the view that in determining whether an inconsistency exists, the court should "*refer to the entire case pleadings, evidence, argument, jury instructions - and not just to the jury's answers themselves*." *Royal Cup, Inc. v. Jenkins Coffee Serv., Inc.*, 898 F.2d 1514, 1521 (11th Cir. 1990).

## CONCLUSION

Upon the arguments set forth above, an affirmance is requested.

ARNALDO VÉLEZ, P.A.
Counsel for Appellees
35 Almeria Avenue
Coral Gables, Florida 33134
Tel: 305-461-9499
Fax: 305-461-9498
avelez@velezlawoffices.com
georgina@velezlawoffices.com

By:/s/*Arnaldo Velez*
FL Bar 149589

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B). This brief contains 9,062 words. This brief is submitted in Times New Roman 14-point font.

ARNALDO VÉLEZ, P.A.
Counsel for Appellees
35 Almeria Avenue
Coral Gables, Florida 33134
Tel: 305-461-9499
Fax: 305-461-9498
avelez@velezlawoffices.com
georgina@velezlawoffices.com

By:/s/*Arnaldo Velez*
FL Bar 149589

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing was on April 12, 2016 filed with the Clerk of the Court using the CM/ECF system, which will serve copies on all parties of record. On that same date, seven copies of the Answer Brief of Appellees were sent via U.S. Mail to the Clerk of the Court.

ARNALDO VÉLEZ, P.A.
Counsel for Appellees
35 Almeria Avenue
Coral Gables, Florida 33134
Tel: 305-461-9499
Fax: 305-461-9498
avelez@velezlawoffices.com
georgina@velezlawoffices.com

By:/s/*Arnaldo Velez*
FL Bar 149589

P:\G V\APPEALS\OCEAN DRIVE\Answer Brief of Appellees.wpd